Andrew P. Marks
David S. Warner
Ronit M. Gurtman
LITTLER MENDELSON, P.C.
900 Third Avenue
New York, NY 10022
212.583.9600

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| QUANTLAB FINANCIAL, LLC and QUANTLAB TECHNOLOGIES LTD. (BVI), | 10 Civ. 2491 (DLC) |
| Plaintiffs, | |
| -against- | **FIRST AMENDED COMPLAINT** |
| TOWER RESEARCH CAPITAL, LLC, | |
| Defendant. | |

Plaintiffs Quantlab Financial, LLC and Quantlab Technologies, LTD (BVI) (collectively, "Plaintiffs"), complaining of Tower Research Capital, LLC ("Tower" or "Defendant") and for their First Amended Complaint and Application for Temporary and Permanent Injunctive Relief, would show as follows:

## Jurisdiction and Venue

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332 because the parties are citizens of different and foreign states and the amount in controversy exceeds $75,000.

2.      Venue properly lies in this Court pursuant to 28 U.S.C. §1391(a).

## The Parties

3.    Plaintiff Quantlab Financial, LLC ("QLF") is a limited liability company, duly formed and existing under the laws of Delaware, with its principal place of business in Houston, Texas.  QLF's members are not citizens of New York, New Jersey or Connecticut.

4.    Plaintiff Quantlab Technologies, LTD (BVI) ("QLT") is an international business company, duly formed and existing under the laws of the British Virgin Islands, with its principal place of business in Bermuda.

5.    Defendant Tower Research Capital, LLC is a limited liability company, formed and existing under the laws of New York, with its principal place of business in New York, New York.  Upon information and belief, Tower's members are citizens of New York, New Jersey, and Connecticut.

## Factual Allegations

### (Nature of Quantlab's Business and Trade Secrets)

6.    The Quantlab group of companies (collectively referred to herein as "Quantlab") is an established privately-held quantitative financial research and technology driven firm, composed of a number of affiliates (including QLF and QLT), supporting a large proprietary automated trading operation.[1]  QLF employs a team of Ph.D. scientists and other professionals to research, develop, maintain and operate a proprietary automated trading strategy on behalf of Quantlab.[2]

7.    Pursuant to various contractual service agreements between them, QLF provides services to the other affiliated members of the Quantlab group, which include researching,

---

[1] As used herein, "automated trading" refers to trading strategies that are reduced to mathematical formulae and algorithms and then translated into machine readable computer code so that the buy/sell decisions are made by computers without human intervention.

[2] As used herein, "proprietary trading" means that the company does not solicit or accept investments from outsiders but rather trades money belonging to the company's owners and employees.

developing, maintaining and operating the proprietary trading strategies and trading technology of Quantlab. The components of the trading strategies and technology are owned by, and licensed between and among, various members of the Quantlab group. QLT is one of these affiliates in the Quantlab group of companies. Among other things, QLT owns computer software that has incorporated into it trade secrets and confidential information related to the trading strategy and technology used by Quantlab that is developed and improved upon by the scientists employed by QLF.

8.      Quantlab's proprietary high-frequency trading strategy applies internally developed mathematical and statistical models to identify profitable trading opportunities on various financial markets and exchanges around the world.[3]

9.      Quantlab's proprietary trading strategy consists of confidential and proprietary analytical models that have been developed by teams of Ph.D. scientists at substantial expense and over a period of years. Quantlab's founders have invested nearly 15 years of effort and over one hundred million dollars ($100,000,000) employing scientists and other professionals and funding research and development. The strategy allows Quantlab to quickly determine, among other things, the estimated future prices of various financial instruments and the optimal portfolio composition of those instruments. These models are translated into mathematical formulae and algorithms and then written into computer source code so that the entire decision-making process can be automated. When in operation, the strategy constantly receives, filters and analyzes real-time market data and then automatically sends buy and sell orders to world markets and exchanges.

---

[3] As used herein, "high-frequency" refers to buying and selling the same security on the same day or intraday trading.

10.     In addition to the strategy, Quantlab develops, maintains and operates proprietary trading technology that consists of highly confidential, internally created software and hardware configurations that are used to implement Quantlab's high-frequency strategy and execute trades on a high-frequency basis around the world.

11.     The success of Quantlab's business is largely dependent upon the confidentiality of its trading strategy.  The trading strategy identifies opportunities in the market.  If others were to employ the same strategy they inevitably would compete with Quantlab for the very same profit opportunities and thereby erode the margin potential or profit that Quantlab's strategy was developed to target.

12.     The research and development—and, ultimately, implementation—of Quantlab's proprietary strategy and trading technology depends upon a large body of confidential information that is not available to persons outside of Quantlab.  This information includes research and analysis of potential predictive indicators, formulae, algorithms and other advanced statistical and mathematical techniques, predictive models, trading methods and computer source code.

13.     The initial development of a high-frequency automated trading strategy involves significant risk and enormous costs associated with time-consuming research, testing, experimentation and adjustment based upon trial and error, with potentially large losses because the trading is automated and happens at speeds that exceed anything a human can achieve without the aid of a computer.  Quantlab enjoys the competitive advantage of having already successfully endured this time-consuming and expensive development stage.

14.     To protect the confidential information and trade secrets used in its business, Quantlab has implemented many security measures, including security controls on access to its

premises allowing only controlled card-key access; security controls on its computers with passwords; limited access to information based upon a need to know it; requiring its employees, as a condition of employment, to agree to noncompete and confidentiality agreements; using computer security controls that monitor activity on the computers; and, prohibiting or monitoring downloading of information to portable storage devices from computers where trade secrets are stored.

### (Factual Background Regarding Xu)

15.     In January 2008, QLF hired Xu as a Quantitative Research Scientist (a position generally referred to as a "Quant"). Xu's job duties included, among other things, enhancing the existing automated trading models or strategy used by Quantlab.

16.     Prior to joining QLF, Xu did not have any significant experience or training in the field of high-frequency automated trading. With the exception of a brief period of work for the Prediction Company ("Pred Co"), where he worked on statistical arbitrage in slower trading strategies, Xu's training and experience was as a astrophysicist working at institutions like the Los Alamos National Laboratory.

17.     Xu's position with QLF included researching ways to improve Quantlab's existing prediction models. This also included working with the ideas, indicators, mathematical models, algorithms and software, testing and research, and the integration of improvements and discoveries acquired through this work into the models and the overarching strategy that gives Quantlab a competitive advantage in automated trading.

18.     QLF's employment of Xu was expressly conditioned upon his acceptance of and compliance with Quantlab's Employee Loyalty, Confidentiality, Inventions, Non-Solicitation, and Non-Competition Agreement (the "Noncompete Agreement") (Exhibit A). This Noncompete Agreement expressly stated that it was made for, and inured to the benefit of, not

only QLF but also all of the other affiliates that are a part of Quantlab. This expressly included QLT. (See Exhibit A, Noncompete Agreement, Section 3(e).) Xu accepted QLF's offer of employment in writing and thereby accepted the terms of the Noncompete Agreement. Xu signed the offer letter that was contingent upon his agreement to the Noncompete Agreement. Xu affirmed that he read and understood the confidentiality and noncompete agreement presented to him upon the commencement of his employment and stated that he "agrees to abide by the agreement." (Exhibit B)

19.    Xu knew, or should have known, that Quantlab was relying upon his representations that he had agreed to confidentiality and noncompete restrictions. Quantlab did rely upon Xu's representation that he had agreed to confidentiality and noncompete restrictions hiring and QLF continued to employ Xu and granted Xu access to Quantlab's confidential information and trade secrets.

20.    Xu was a salaried employee scientist hired by QLF to research, develop, improve and perhaps discover trading models or the strategy on behalf of Quantlab.[4]

21.    Xu spent approximately 12-18 months working on Quantlab's trading strategy, learning how it worked and all of the keys to its success. Xu then began to market himself to competing firms engaged in the narrow niche of high-frequency automated trading. Upon information and belief, Xu was attempting to improperly monetize his knowledge of the valuable secrets behind Quantlab's successful high-frequency automated trading strategy.

---

[4] All ideas, inventions, works, and other developments or improvements that were related in any way to the subject of Quantlab's business or anticipated future businesses conceived or reduced to practice by Xu, alone or with others, during the period of time he was employed with QLF, whether or not during working hours, was the property of QLF. This is understood to be the effect of his employment as a Quant, and is also expressly provided for in his contract with QLF. Any proven strategies that Xu could offer to a potential employer would necessarily belong to Quantlab. Moreover, any such proven strategies would have to be derived from the confidential and proprietary information Xu acquired while an employee of QLF. Xu had no experience in the niche industry of high-frequency automated trading prior to working for QLF. Any work Xu did proving a strategy was work done for Quantlab (thus Quantlab's property) whether done during working hours or not.

22.     QLF filed a lawsuit (*Quantlab Financial, LLC v. Yongzhong Xu, Automat Ltd., et at.*, No. 2009-50815 (Harris Co., Aug. 10, 2009), in Texas against Xu to prevent him from working for a competitor other than Tower and that competitor withdrew its employment offer to Xu after some discovery in the case, Xu then began to pursue employment with Tower but delayed informing QLF of this until shortly before his start date - a period of time that was too short to allow QLF a reasonable opportunity to secure discovery through formal means prior to an injunction hearing.   QLF attempted to secure informal discovery cooperation from Tower related to its dealings with Xu, but Tower has been noncompliant.  An injunction has been issued against Xu by the Texas court but it does not specifically prohibit him from going to work in the proposed position with Tower that is at issue in this case.

**(Tower's Business and Offer of Employment to Xu)**

23.     Tower is known in the industry to be a competing high-frequency automated trading firm.  Tower's website acknowledges that it is "a high-frequency proprietary trading firm founded in 1998."

24.     Tower advertises its desire to hire Quants who can deliver an already proven trading strategy.   According to Tower's website: "Tower is always looking for exceptional Experienced Quantitative Traders. Tower highly values consistent profitability of trading strategies."  In fact, one of the qualifications for the position of Experienced Quantitative Trader at Tower is a "strategy that is currently and consistently profitable...."

25.     The discussions between Xu and Tower resulted in the exchange of offers as early as December 2009 and a job offer to Xu as a "Portfolio Manager."  QLF did not learn of this

offer until February 8, 2010.[5]  In his deposition, Xu has described the position he has been offered at Tower as one that involves a requirement for him to develop an automated trading model using an unencumbered range of options that include high-frequency trading strategies with hold times as short as one hour.

26.    Xu's delay in advising QLF of his job offer from Tower prevented QLF from conducting discovery on the precise aspects of Xu's position with Tower.  Upon learning of the negotiations between Tower and Xu, QLF immediately engaged in efforts to learn the details of the job offer and position.  Initially, Tower feigned cooperation with QLF's discovery efforts, but then produced no meaningful documentary discovery regarding Xu's duties at Tower.  And, shortly before Xu's original start date, Tower yanked back its overtures towards cooperation and demanded that any discovery be conducted through time-consuming formal measures that it knew could not be completed prior to Xu's start date, as those measures would necessarily require QLF to conduct protract discovery on an out-of-state entity through the letters rogatory process.

27.    According to the "draft" offer letters provided Xu, the position offered by Tower provides him with substantial bonus and profit sharing opportunities that could run into the millions of dollars if *he can deliver a proven strategy quickly*—in spite of the undisputed fact that Xu has never developed an automated trading strategy and, indeed, has only been employed in the quantitative trading industry for approximately 18 months.  Tower's offer thus incentivizes Xu to use his knowledge of Quantlab's trade secrets and confidential information about its

---

[5] Xu was under an obligation to promptly advise QLF of the job offers he began discussing with Tower from at least three different perspectives: (1) a contractual obligation via the notice clause in his Noncompete Agreement, (2) his obligation to supplement written discovery responses in the Texas Lawsuit, and (3) his representations to the court in the Texas Lawsuit that he would advise QLF of any new job offers he received in time for QLF to have a fair opportunity to evaluate the position before he began employment.

trading strategy, technology and confidential methods of operation to build a successful trading model without the years of trial and error and massive financial investment it took Quantlab to develop such a model.

28.     Under Xu's Noncompete Agreement, he is prohibited from certain activities following his employment with QLF:

> (c) *LIMITATIONS ON WORK FOR COMPETITORS. For a period of two years following termination of employment with the Company, Employee shall not without prior written permission from Employer:*
>
> (i) *directly or indirectly perform for, render advice to, or otherwise assist a Competitor in any position, job, task function, or responsibility that is substantially similar to the position, job, task; function, or material responsibilities that Employee performed on behalf of the Company at any time during the final two (2) years of employment with the company; or*
>
> (ii) *directly or indirectly (including as a consultant or independent contractor) accept employment with a Competitor in a position, or render consulting services to a Competitor relating to such subjects, that Confidential Information to which Employee had access during the Period of Employment would likely assist the Competitor.*

29.     Xu's last day of employment with QLF was August 10, 2009.

30.     Tower's employment of Xu would, by its very nature, violate both his contractual and common law obligations under the Noncompete Agreement.

31.     Tower is aware of Xu's contractual and common law obligations under the Noncompete Agreement.

32.     By employing Xu in a position where he will inevitably use Quantlab's confidential information and trade secrets to develop a high-frequency automated trading strategy; Tower is facilitating, aiding and abetting Xu's breach of contract and violation of fiduciary duty, interfering with Xu's contractual obligations to Quantlab, and ratifying and accepting the benefit of this wrongful conduct.

**(Imminent Irreparable Harm)**

33.     Quantlab is of the current understanding that unless restrained, Xu's active employment with Tower is anticipated to begin Monday, March 22, 2010. Xu is ordered to be in attendance at a mediation that is to occur in Houston, Texas, on Friday, March 19, 2010, in connection with the Texas Lawsuit. On March 16, 2010, Tower indicated directly to QLF that Tower has reviewed (1) Xu's offer letter with QLF, (2) Xu's Noncompete Agreement, (3) Xu's subsequent written affirmation of the Noncompete Agreement and nevertheless intends to allow Xu to start work in the week of March 22, 2010.

34.     Based upon the information Xu has disclosed about the position that Tower has hired Xu to fill, it appears that it is one that by its nature will result in Xu violating the Noncompete Agreement and inevitably disclosing Quantlab's trade secrets to Tower. As explained in greater detail above, the position that Tower has hired Xu to fill is one that by its nature will lead him to use or disclose confidential information and trade secrets entrusted to Xu in confidence by Quantlab. Xu cannot avoid, even in the exercise of utmost good faith, the use of confidential information and trade secrets he acquired in the course of employment with QLF.

35.     If Xu is allowed to go forward with active employment in the proposed employment position with Tower, it will cause irreparable harm to Plaintiffs. Once lost, Quantlab's trade secrets cannot be restored. Once lost, Quantlab's competitive advantage cannot be restored. The nature of the losses that would be caused over time if Quantlab's trade secrets and confidential information were disclosed to others, or used to help a competing business cannot be fully quantified or fully measured.

36.     The Noncompete Agreement recognizes and acknowledges that a violation of its restrictions would create irreparable harm to Quantlab (which would be inclusive of QLF and QLT) warranting injunctive relief.

## FIRST CAUSE OF ACTION
### (Tortious Interference)

37.    Quantlab repeats and realleges each and every allegation set forth in paragraphs 1 through 36 hereof as if fully set forth herein.

38.    Xu's Noncompete Agreement creates certain restrictions and obligations for Xu. Tower has induced Xu to violate these contractual obligations by inducing him to become employed with it (a competitor as defined in the Noncompete Agreement) and by inducing him to undertake job duties that would require the violation of Xu's contractual obligation to protect and not use or disclose the confidential information and trade secret information about Quantlab's business that Xu acquired in the course of his employment.

39.    By his aforesaid wrongful actions, Tower has caused and will continue to cause Xu to breach his contractual obligations to QLF and QLT (as an express intended third-party beneficiary of the contract).

40.    Tower's interference with Plaintiffs' contractual rights is willful, malicious and wanton.

41.    As a result of such wrongful interference, unless Tower is enjoined from going forward with the employment of Xu in violation of his Noncompete Agreement, Plaintiffs have suffered and will continue to suffer irreparable and incalculable harm, including the loss of proprietary and confidential information and business methods for which they can never be compensated.  No adequate remedy at law exists for such a breach.

## SECOND CAUSE OF ACTION
### (Unfair Competition)

42.    Plaintiff's repeat and reallege each and every allegation set forth in paragraphs 1 through 41 hereof as if fully set forth herein.

43.     Tower has engaged in unfair competition by, among other things, participating with Xu in scheme to acquire a "knowledge transfer" from Xu that provides a proven high-frequency automated trading strategy, which is derived from and unavoidably incorporates Quantlab's proprietary trading strategy, confidential information and trade secrets without authorization.

44.     As a result of the aforesaid actions by Tower, Plaintiffs have suffered and will continue to suffer economic and also immediate and irreparable harm.

45.     Unless Tower is enjoined from going forward with the employment of Xu and thereby achieving the aforementioned knowledge transfer, Plaintiffs have suffered and will continue to suffer irreparable and incalculable harm, including the loss of proprietary and confidential information and business methods for which they can never be compensated.  No adequate remedy at law exists for such a breach.  Money damages alone are inadequate to fully compensate Plaintiffs for the incalculable loss of its competitive advantage, good will and trade secrets caused by Tower's wrongful acts.

### THIRD CAUSE OF ACTION
**(Misappropriation)**

46.     Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 45 hereof as if fully set forth herein.

47.     Upon information and belief, Tower is pursuing a plan to intentionally and wrongfully misappropriate Quantlab's property, including its confidential or proprietary information consisting of work product and computer programs, through a knowledge transfer from Xu.

48.     As a result of the aforesaid actions by Tower, Plaintiffs have suffered and will continue to suffer economic damages as well as immediate and irreparable harm to its business and goodwill.

49.     Unless Tower is enjoined from going forward with the employment of Xu and thereby achieving the aforementioned knowledge transfer, Plaintiffs have suffered and will continue to suffer irreparable and incalculable harm, including the loss of proprietary and confidential information and business methods for which they can never be compensated.  No adequate remedy at law exists for such a breach.  Money damages alone are inadequate to fully compensate Plaintiffs for the incalculable loss of their competitive advantage, good will and trade secrets caused by Tower's wrongful acts.

### FOURTH CAUSE OF ACTION
### (Unjust Enrichment)

50.     Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 49 hereof as if fully set forth herein.

51.     Xu owes Quantlab an ongoing duty (a) not to use for the benefit of any person or entity other than Quantlab any of the intellectual property in his possession or control acquired or developed by him while employed with QLF, whether created or developed alone or with others, and whether created or developed during regular working hours or not, because all such intellectual property belongs to QLF and/or the Quantlab group member that QLF is providing services for when it employs Xu, (b) not to use or disclose any confidential information or trade secrets he acquired in the course of employment with QLF for the benefit of any person or entity other than Quantlab, and (c) not to provide assistance to any person or entity that competes with Quantlab in any role or manner that would violate his Noncompete Agreement.  By employing

Xu in a position that violates the aforementioned duties, and receiving the financial benefit of Xu's conduct in violation of these duties, Tower is unjustly enriched.

52.    By participating in such acts of unjust enrichment, Tower has and will continue (unless enjoined from doing so) to intentionally, willfully and without justification be enriched at the expense and harm of Plaintiffs.

53.    No adequate remedy at law exists for such an unjust enrichment as the value of the use of Quantlab's intellectual property, and confidential information and trade secrets cannot be assigned a specific monetary value. Likewise, money damages alone are inadequate to fully compensate Plaintiffs for the incalculable loss of their competitive advantage, good will and trade secrets caused by Tower's utilization of Xu as an employee in violation of his Noncompete Agreement.

## FIFTH CAUSE OF ACTION
### (Negligence)

54.    Plaintiffs repeat and reallege each and every allegation set forth in paragraphs 1 through 53 hereof as if fully set forth herein.

55.    Tower had a heightened duty of care to insure that Xu's employment would not violate any of his duties to Quantlab once it became aware of Xu's past acts of misconduct (such as Xu's disloyalty in pursuing a competing enterprise while still employed with Quantlab, and his efforts to take confidential information and trade secrets acquired in the course of his employment with QLF and use them to deliver a proven trading strategy to a competitor without the ordinary time, expense and risk that would be required to develop a trading strategy through lawful means). Tower's duty of care included a duty to avoid employing Xu in a position that would cause harm to the trade secrets and confidential information of Quantlab.

56.    Tower has acted negligently and without due care in acting to employ Xu in a position where he will, by nature of the position involved, be required to use or disclose confidential information and trade secrets of Quantlab.

57.    Unless Tower is enjoined from going forward with its employment with Xu in the position currently scheduled, Plaintiffs have suffered and will continue to suffer irreparable and incalculable harm, including the loss of proprietary and confidential information and business methods for which they can never be compensated.  No adequate remedy at law exists for such a harm.  Money damages alone are inadequate to fully compensate Plaintiffs for the incalculable loss of competitive advantage, good will and trade secrets caused by Tower's wrongful acts.

## **REMEDY SOUGHT**

WHEREFORE, Plaintiffs respectfully request that judgment be made and entered against Defendant as follows:

(1)    AS TO ALL CAUSES OF ACTION, an award granting Plaintiffs damages in excess of $75,000, the precise amount to be determined at trial;

(2)    AS TO THE FIRST, SECOND AND THIRD CAUSES OF ACTION: A preliminary and permanent injunctions, whereby Defendant Tower, and all persons acting in concert with it, would be enjoined from:

(a)    Directly or indirectly employing Yongzhong Xu ("Xu"), through August 31, 2011, in any position with Tower (as a competitor to Quantlab in high-frequency automated trading),[6] and particularly in any role where Xu:

(i)    performs for, advises on, renders advice to, or otherwise assists Tower in any position, job, task, function or responsibility that is substantially similar to the positions, jobs, tasks, functions or material responsibilities that Xu performed for QLF during the last two years of his employment with it; or,

(ii)    directly or indirectly (as a consultant, advisor, or otherwise) renders services, consulting or advice that relates to subjects where

---

6 As used herein, "high-frequency" refers to buying and selling the same security on the same day or intraday trading. As used herein, "automated trading" refers to trading strategies that are reduced to mathematical formulae and algorithms and then translated into machine readable computer code so that the buy/sell decisions are made by computers without human intervention.

        trade secrets or confidential information that Xu had access to during his employment with QLF would be likely to be used to assist Tower;

(b)    Directly or indirectly assisting Xu through August 31, 2011, with any business activities in the field of high-frequency automated trading that are competitive to Quantlab; and

(c)    Using or disclosing any confidential data or trade secrets belonging to Quantlab that were created, discovered, used or tested, or being developed, by Quantlab during Xu's employment there including any (i) information, research or analysis relating to Quantlab's high-frequency automated trading strategy including the specific opportunities the strategy attempts to capture, potential and actual predictive indicators, predictive models, mathematical formulae, algorithms, and computer source code developed by Quantlab; (ii) any concepts or ideas for improvement, development, experimentation, in trading strategies or models or means of executing same; (iii) inventions, original works of authorship, discoveries, developments, improvements, or other items of intellectual property; (iv) any information or data related to the performance of Quantlab's trading strategy or models, the performance of its systems for the execution of trades, and its financial information; and, (v) compilations of information, analysis, formulae, or other data, compiled or created by Quantlab for use in its business, regardless of whether or not this compilation contains items of individual information or data that might be available through a public source so long as the compilation itself is confidential to Quantlab; and

(3)    AS TO ALL CAUSES OF ACTION: an order granting a constructive trust in favor of Plaintiffs to be imposed upon all proceeds of Xu's wrongful acts, and all profits gained from any business activities in which Xu participates in violation of his contractual or common law duties to Plaintiffs; and

(4)    Plaintiffs' reasonable attorneys' fees; and

(5)    Plaintiffs' disbursements and costs of suit, and pre-judgment and post-judgment interest in the maximum amounts allowed by law; and

(6)    Awarding Plaintiffs exemplary damages in a sum to be determined by the Court and finders of fact in an amount reasonable and necessary to punish the Defendant for willful, malicious and wrongful conduct and to deter future misconduct; and

(7)    Granting Plaintiffs such other and further relief as the Court may deem just, equitable, and proper.

Dated: April 12, 2010
      New York, New York

LITTLER MENDELSON, P.C.

_____

Andrew P. Marks
David S. Warner
Ronit Gurtman

900 Third Avenue
New York, NY 10022
212.583.9600
amarks@littler.com
dwarner@littler.com
rgurtman@littler.com

Attorneys for Plaintiffs