UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                      :

QUANTLAB FINANCIAL, LLC, QUANTLAB    :
TECHNOLOGIES LTD. (BVI),
                  Plaintiffs,   :    10 Civ 2491 (DLC)
                                   :

        -v-                 :    <u>OPINION & ORDER</u>
                                   :

TOWER RESEARCH CAPITAL, LLC,       :
                    Defendant.   :
                                   :
----------------------------------------X

APPEARANCES:

For Plaintiffs:

Andrew P. Marks
David S. Warner
Littler Mendelson, P.C.
900 Third Avenue
New York, NY 10022

For Defendant:

Peter L. Altieri
David J. Clark
Epstein, Becker & Green, P.C.
250 Park Avenue
New York, NY 10177


DENISE COTE, District Judge:

    This action arises out of an alleged noncompete agreement

between plaintiff Quantlab Financial, LLC ("QLF"), an automated

high-frequency trading firm, and its former employee, Dr.

Yongzhong Xu ("Xu").  Defendant Tower Research Capital, LLC

("Tower"), a competitor of QLF, has offered employment to Xu.

On March 19, 2010, QLF filed this action against Tower, alleging

that Tower's employment of Xu would violate the noncompete agreement.  The same day, QLF brought an order to show cause to enjoin Xu's employment at Tower.  After a conference with both parties, QLF's application was granted and a temporary restraining order was entered.  On April 5, having been informed that there may not be complete diversity between the parties, the Court sua sponte ordered QLF to show cause why this action should not be dismissed for lack of subject matter jurisdiction (the "April 5 Order").  On April 13, Tower separately moved to dismiss this action for failure to join an indispensable party, namely Xu, or, in the alternative, to vacate the temporary restraining order.  The same day, QLF filed a first amended complaint ("FAC") which added as a plaintiff, Quantlab Technologies Ltd. (BVI) ("QLT," collectively with QLF, the "plaintiffs").

This Opinion addresses the parties' submissions in response to the April 5 Order and Tower's April 13 motion to dismiss. For the following reasons, plaintiffs' request to drop QLF as a plaintiff to preserve diversity jurisdiction is granted. Because Xu may now be joined as a defendant without destroying diversity, Tower's motion to dismiss for failure to join an indispensable party is denied.  Tower's request to vacate the temporary restraining order is also denied.

BACKGROUND

The following facts are taken from the FAC and the relevant submissions of the parties.  See St. Paul Fire and Marine Insurance Company v. Universal Builders, 409 F.3d 73, 80 (2d Cir. 2005) ("It is . . . well established that when the question is subject matter jurisdiction, the court is permitted to rely on information beyond the face of the complaint.") ("St. Paul Fire").

1.   Quantlab and the Noncompete Agreement

QLF and QLT are two of a number of "affiliates" that comprise the Quantlab group of companies ("Quantlab").  QLF employs a team of scientists and other professionals to research, develop, maintain, and operate a proprietary, high-frequency automated trading strategy on behalf of Quantlab.[1] Quantlab's trading strategy consists of confidential and proprietary analytical models that were developed over a period of years at substantial expense.  In addition to the strategy, Quantlab has developed proprietary trading technology that

---

[1] According to the FAC, "automated trading" refers to trading strategies that are reduced to mathematical formulae and algorithms and then translated into machine readable computer code so that the buy/sell decisions are made by computers without human intervention.  "Proprietary trading" means that the company does not solicit or accept investment from outsiders, but rather trades money belonging to the company's owners and employees.  And "high frequency" refers to buying and selling the same security on the same day or intraday trading.

consists of highly confidential, internally created software and hardware configurations used to implement Quantlab's strategy and to execute trades.  The success of Quantlab's business is largely dependent on the confidentiality of its trading strategy and technology, i.e., its trade secrets.

Pursuant to various contractual service agreements, QLF provides services to the other affiliates of Quantlab, including research, development, maintenance, and operation of Quantlab's trading strategy and trading technology.  The various components of Quantlab's trading strategies and technologies are owned by, and licensed between and among, Quantlab's various affiliates. Among other things, QLT owns the computer software that has been developed by Quantlab's scientists and incorporated into Quantlab's proprietary trading strategy and technology.

In January 2008, QLF hired Xu as a Quantitative Research Scientist.  Xu's responsibilities included, among other things, enhancing Quantlab's trading models and strategy.  This involved working with Quantlab's ideas, indicators, mathematical models, algorithms, and software; testing and research; and the integration of improvements and discoveries acquired through this work into Quantlab's models and strategy.  Xu's employment was purportedly conditioned upon his acceptance of and compliance with the "Quantlab Financial, LLC Employee Loyalty, Confidentiality, Inventions, Non-Solicitation, and Non-

Competition Agreement" (the "Noncompete Agreement").  Plaintiffs allege that Xu signed an employment offer letter that was contingent upon his agreement to the Noncompete Agreement, and thereby agreed "to abide by the agreement."  Xu disputes that he executed or entered into the Noncompete Agreement.


2.   Tower's Offer of Employment to Xu

After working at QLF for approximately eighteen months, Xu's employment ended on August 10, 2009.  The same day, QLF filed a lawsuit in Texas to prevent Xu from working for a competitor.  See Quantlab Financial, LLC v. Yongzhong Xu, et al., No. 2009-50815 (Harris Co., Aug. 10, 2009) (the "Texas action").  While the prospective employer withdrew Xu's employment offer after initial discovery, the Texas action remains pending between QLF and Xu.  In December 2009, Tower offered Xu employment as a "Portfolio Manager."  QLF learned about Tower's offer on February 8, 2010.  Plaintiffs assert that Xu's prospective position at Tower would require him to develop an automated trading model involving high-frequency trading strategies.  Thus, according to plaintiffs, Tower's employment of Xu would, by its very nature, violate Xu's contractual and common law obligations under the Noncompete Agreement, and inevitably lead to disclosure of Quantlab's confidential information and trade secrets to Tower.

Prior to filing this action, QLF sought a temporary injunction in the Texas action to prevent Xu from beginning employment with Tower.  On March 16, 2010, the court overseeing the Texas action entered a temporary injunction enjoining Xu from directly or indirectly using or disclosing Quantlab's proprietary financial models, source code, and backtesting results that contain Quantlab's trade secrets or confidential information.  The temporary injunction entered in the Texas action does not, however, prevent Xu from beginning his employment at Tower.

3.   This Litigation

On March 19, QLF brought this action against Tower.  The original complaint included claims for tortious interference, unfair competition, misappropriation, unjust enrichment, negligence, and civil conspiracy.  The sole basis for federal jurisdiction asserted in the complaint was diversity of the parties.  Also on March 19, QLF brought an order to show cause to enjoin Xu's employment at Tower, which was scheduled to begin on March 22.  After hearing from both parties, and having found, inter alia, that Xu's employment at Tower would cause irreparable harm to QLF, a temporary restraining order was entered to prevent Xu from beginning work at Tower.  Pursuant to the Court's discussions with the parties, the March 19 Order

provided that Tower was free to ask for a preliminary injunction hearing and expedited discovery, but until it did so, the parties consented to the temporary restraining order remaining in place with the exception that "the parties with the consent of this Court may litigate the merits of this action before the courts of Texas."

On March 30, Tower filed an "Original Petition in Intervention" in the Texas action.  On April 13, QLF moved to strike Tower's petition to intervene in the Texas action.  After hearing oral argument on April 22, the Texas court denied Tower's petition to intervene on April 23.  At the time Tower's petition was denied, trial in the Texas action was set to begin in approximately sixty days (i.e., late June).

On April 5, after having requested and received letters from QLF and Tower concerning the citizenship of their respective members, QLF was ordered, sua sponte, to show cause why this action should not be dismissed for lack of subject matter jurisdiction since it appeared that both QLF and Tower had New York citizenship.  QLF submitted its response to the April 5 Order on April 12, and Tower submitted its reply on April 22.

On April 13, Tower filed a motion to dismiss this action pursuant to Fed. R. Civ. P. 12(b)(1), 12(b)(7), and 19, or, in the alternative, to vacate the temporary restraining order.  In

its motion, Tower argues, <u>inter alia</u>, that QLF failed to join as a defendant Xu, who Tower asserts is a necessary and indispensable party.  Because Xu is a permanent resident residing in Texas, and since QLF also has Texas citizenship, Tower argued that Xu's joinder would destroy complete diversity and thereby divest the Court of subject matter jurisdiction.

On April 13, plaintiffs filed the FAC, which added as a plaintiff QLT and dropped civil conspiracy as a cause of action. The parties agreed that Tower's pending motion to dismiss should be applied to the FAC.  The motion became fully submitted on April 22.

DISCUSSION

1.   Federal Subject Matter Jurisdiction

"'It is a fundamental precept that federal courts are courts of limited jurisdiction' and lack the power to disregard such limits as have been imposed by the Constitution or Congress." <u>Durant, Nichols, Houston, Hodgson, & Cortese-Costa, P.C. v. Dupont</u>, 565 F.3d 56, 62 (2d Cir. 2009) (quoting <u>Owen Equip. & Erection Co. v. Kroger</u>, 437 U.S. 365, 374 (1978)). Because this case presents no federal question, it must be determined whether it may be maintained on the basis of diversity jurisdiction.  "Diversity jurisdiction exists over 'civil actions where the matter in controversy exceeds the sum

8

or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States.'"  <u>Hallingby v. Hallingby</u>, 574 F.3d 51, 56 (2d Cir. 2009) (quoting 28 U.S.C. § 1332(a)(1)).  "'Citizens of different States' means that there must be complete diversity, <u>i.e.</u>, that each plaintiff's citizenship must be different from the citizenship of each defendant."  <u>Id.</u> (citing <u>Caterpillar Inc. v. Lewis</u>, 519 U.S. 61, 68 (1996); <u>Strawbridge v. Curtiss</u>, 7 U.S. (3 Cranch) 267 (1806)).

QLF is a limited liability company whose membership consists of several layers of unincorporated artificial associations.  It is an "oft-repeated rule that diversity jurisdiction in a suit by or against [an artificial] entity depends on the citizenship of 'all the members'" of the entity. <u>Carden v. Arkoma Assocs.</u>, 494 U.S. 185, 195-96 (1990) (quoting <u>Chapman v. Barney</u>, 129 U.S. 677, 682 (1889)).  QLF's citizenship depends on the citizenship of its sole member, Quantlab Holdings, LLC, and, in turn, on the citizenship of Quantlab Holdings, LLC's members, including Quantlab Group, LP.  <u>See</u> <u>Handelsman v. Bedford Vill. Assocs. Ltd. P'ship</u>, 213 F.3d 48, 51-52 (2d Cir. 2000) ("[F]or purposes of diversity jurisdiction, a limited liability company has the citizenship of its membership.").  The citizenship of Quantlab Group, LP, a limited partnership, depends on the citizenship of all its general and

limited partners.  See id. at 52 ("[L]imited partnerships have
the citizenship of each of its general and limited partners."
(citing Carden, 494 U.S. at 195-96)).  Quantlab Group, LP's
general partner is Quantlab Group GP, LLC, whose two members are
Marco, LP ("Marco") and AVG Holdings, LP ("AVG"), both limited
partnerships.  Marco's general partner is Marco GP, LLC, whose
sole member is South Ocean Trust.  AVG's general partner is AVG
Holdings GP, LLC, whose sole member is The Aragorn Trust.  The
South Ocean and Aragorn trusts share the same trustee, The South
Dakota Trust Company, LLC ("SDTC").

Because SDTC is a limited liability company, its
citizenship depends on the citizenship of all its members.
Handelsman, 213 F.3d at 51-52.  One of SDTC's members is a
citizen of New York, and therefore SDTC, like defendant Tower,
has New York citizenship for purposes of diversity jurisdiction.
Whether complete diversity exists in this case thus hinges on
whether the citizenship of SDTC, as trustee for the South Ocean
and Aragorn trusts, should be considered in determining the
citizenship of QLF.

While neither the Supreme Court nor the Court of Appeals
for the Second Circuit has squarely addressed the question of
how to determine the citizenship of a trust for diversity
jurisdiction purposes, precedent suggests that a court must
look, at least in part, to the citizenship of the trust's

trustee or trustees.[2]  Many decisions addressing this question have been guided by the discussion in Navarro Savings Ass'n v. Lee, 446 U.S. 458 (1980) ("Navarro").  In Navarro, the Supreme Court held that "a trustee is a real party to the controversy for purposes of diversity jurisdiction when he possesses certain customary powers to hold, manage, and dispose of assets for the benefit of others."  Id. at 464.  Thus, where a trustee possesses exclusive authority to deal with trust property, free of any control by the beneficiaries, a trustee qualifies as a "real part[y] to the controversy" and is entitled to "sue in [its] own right, without regard to the citizenship of the trust beneficiaries."  Id. at 465-66.

Citing the Supreme Court's decision in Navarro, the Court of Appeals for the Second Circuit has noted that "[t]he test for determining the existence of diversity jurisdiction is generally 'the citizenship of real parties to the controversy.'"  E.R. Squibb & Sons, Inc. v. Accident & Cas. Ins. Co., 160 F.3d 925, 930 (2d Cir. 1998) (quoting Navarro, 446 U.S. at 461) ("Squibb").  In Squibb, the Court of Appeals recognized that the "general rule" in any inquiry as to the existence of diversity directs the court to examine the citizenship of the "individuals being represented rather than their collective representative."

---

[2] While the citizenship of a trust may also depend on the citizenship of the trust's beneficiary or beneficiaries, this action does not present an occasion to address this issue.

Id. at 931 (citation omitted).  Nonetheless, there are well-established exceptions to this general rule, and the Court of Appeals listed trusts as one such exception.  With respect to trusts, the Court of Appeals observed that "the Supreme Court has deemed the citizenship of the trustees to be determinative." Id.

Navarro and Squibb did not, however, directly address the issue of how to analyze the citizenship of a trust; they analyzed whether the plaintiffs in those actions qualified as "real parties to the controversy" whose citizenship alone was determinative for diversity jurisdiction purposes.[3] Nevertheless, courts of appeals in other circuits have held that the citizenship of a trust depends, at least in part, on the citizenship of the trustee or trustees.  See Grede v. Bank of New York Mellon, 598 F.3d 899, 901 (7th Cir. 2010); Mullins v. TestAmerica, Inc., 564 F.3d 386, 397 n.6 (5th Cir. 2009); Emerald Investors Trust v. Gaunt Parsippany Partners, 492 F.3d 192, 205 (3d Cir. 2007) ("Emerald Investors"); Johnson v. Columbia Props. Anchorage, LP, 437 F.3d 894, 899 (9th Cir.

---

[3] In Navarro, the question presented was whether "trustees of a business trust may invoke the diversity jurisdiction of the federal courts on the basis of their own citizenship, rather than that of the trust's beneficial shareholders." Navarro, 446 U.S. at 458.  Similarly, in Squibb, the question was whether the citizenship of certain underwriters at Lloyd's of London could be determined solely by reference to the citizenship of the Lloyd's representative lead underwriter.  Squibb, 160 F.3d at 928-29.

12

2006); cf. Lenon v. St. Paul Mercury Ins. Co., 136 F.3d 1365, 1371 (10th Cir. 1998) (citizenship of trustees of ERISA plan, which the court treated as a trust, was determinative for diversity purposes where trustees brought action in their own name). But see Riley v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 292 F.3d 1334, 1338 (11th Cir. 2002) (holding that citizenship of business trusts is "to be determined on the basis of the citizenship of their shareholders"), abrogated on other grounds by Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit, 547 U.S. 71, 89 (2006).

Likewise, courts in this district have held that a trust's citizenship depends on the citizenship of its trustee or trustees. See, e.g., Feiner Family Trust v. VBI Corp., No. 07 Civ. 1914 (RPP), 2007 WL 2615448, at *3 (S.D.N.Y. Sept. 11, 2007); Dargahi v. Hymas, No. 05 Civ. 8500 (BSJ), 2007 WL 2274861, at *4 (S.D.N.Y. Feb. 9, 2007). But see FMAC Loan Receivable Trust 1997-C v. Strauss, No. 03 Civ. 2190 (LAK), 2003 WL 1888673, at *1 (S.D.N.Y. Apr. 14, 2003) (citizenship of "member, beneficiary or shareholder" of business trust determinative for diversity purposes) ("FMAC").

While the Supreme Court's decision in Carden, 494 U.S. 185, has cast doubt on reliance on Navarro in support of a rule that a trust's citizenship depends on the citizenship of the trustee, see Carden, 494 U.S. at 192-93 (stating that "Navarro had

13

nothing to do with the citizenship of [a] 'trust,' since it was a suit by the trustees in their own names"), Carden does not suggest that a trustee's citizenship should not be considered at all.  Indeed, a rule that the citizenship of a trust depends, at least in part, on the citizenship of its trustee accords with Carden's directive that the citizenship of artificial entities depends on the citizenship of "all of the entity's members." Id. at 195.  As the Third Circuit reasoned in Emerald Investors, there is no reason why a trustee should not be deemed a "member" of a trust.  Emerald Investors, 492 F.3d at 206.  Given that a trustee –- at least one who possess "certain customary powers to hold, manage, and dispose of assets for the benefit of others," Navarro, 446 U.S. at 464 –- may be deemed a "real party to the controversy," it would be incongruous not to base the citizenship of a trust, at least in part, on the citizenship of its trustee.  Furthermore, since a trustee may be the public face of a trust, taking the trustee's citizenship into account is consistent with the purpose behind diversity jurisdiction, namely "to provide an impartial forum for out-of-state parties who might be subject to prejudice in local state courts." Prudential Oil Corp. v. Phillips Petroleum Co., 546 F.2d 469, 574 (2d Cir. 1976).

Plaintiffs contend that the citizenship of SDTC should be disregarded and that the citizenship of the South Ocean and

Aragorn trusts, both "directed trusts" created by South Dakota statute, should be based solely on the citizenship of the trusts' beneficiaries or investment committees.  Plaintiffs' principal argument is that SDTC is an "administrative trustee" and that the trusts' investment committees, rather than SDTC, are responsible for holding, managing and disposing of the trusts' assets.[4]  While SDTC's powers as administrative trustee may be relevant for determining whether SDTC may be deemed a "real party to the controversy" under Navarro, and thus capable of suing or being sued on behalf of the trusts, a trustee's powers have no bearing on the citizenship of the trust.

Plaintiffs provide no legal authority to support their contention that a court should ignore the citizenship of an administrative trustee and focus only on the citizenship of the beneficiaries.  Their reliance on Arias v. Budget Truck Trust I, No. 09 Civ. 0774 (BMC), 2009 WL 604864, at *1 (E.D.N.Y. Mar. 5, 2009) ("Arias"), and FMAC, 2003 WL 1888673, is unavailing. While the courts in Arias and FMAC found that the citizenship of shareholders in a business trust must be considered for

---

[4] The investment committees of The Aragorn Trust and the South Ocean Trust consist solely of Bruce Earnes, a citizen of Texas, and Capital Technologies, Inc., a Nevada corporation whose principal place of business is Texas, respectively.  According to an affidavit submitted by one of SDTC's trust officers, SDTC "must effectuate and follow the directions of the trusts' respective investment committees in connection with the holding, management and disposition (not distribution) of each trust's assets."

determining the citizenship of a business trust, neither decision was required to address, much less held, that the citizenship of the trustee should be disregarded.

Lastly, a rule that requires a court to analyze the functions and powers of a trustee in order to determine whether that trustee's citizenship should be considered for purposes of diversity jurisdiction would place a "great and unnecessary burden" on the litigants and the court. Emerald Investors, 492 F.3d at 203.  As the Supreme Court recently reiterated, "[c]omplex jurisdictional tests complicate a case, eating up time and money as the parties litigate, not the merits of their claims, but which court is the right court to decide those claims." Hertz Corp. v. Friend, 130 S.Ct. 1181, 1193 (2010). The approach advocated by plaintiffs would undermine this preference for simple jurisdictional rules.

Accordingly, the citizenship of SDTC may not be ignored when analyzing the citizenship of the South Ocean and Aragorn trusts for purposes of diversity jurisdiction.  Because SDTC has New York citizenship, both trusts are citizens of New York, as is QLF.  Thus, both QLF and Tower have New York citizenship and complete diversity is lacking.  This action must therefore be dismissed for lack of subject matter jurisdiction if QLF remains a plaintiff.

2.   Plaintiffs' Request to Drop QLF

Plaintiffs seek to salvage diversity jurisdiction by dropping QLF from the action, thereby leaving QLT, a foreign citizen, as the sole plaintiff.[5]  Fed. R. Civ. P. 21 provides in relevant part:  "On motion or on its own, the court may at any time, on just terms, add or drop a party."  Rule 21 "allows a court to drop a nondiverse party at any time to preserve diversity jurisdiction, provided the nondiverse party is not 'indispensable' under Rule 19(b)."[6]  CP Solutions PTE, Ltd. v. Gen. Elec. Co., 553 F.3d 156, 159 (2d Cir. 2009) (citing Newman-Green, Inc. v. Alfonzo-Larrain, 490 U.S. 826, 832 (1989)); see also St. Paul Fire, 409 F.3d at 82 (dropping non-diverse plaintiffs to preserve diversity jurisdiction); LeBlanc v. Cleveland, 248 F.3d 95, 98 (2d Cir. 2001) (same).

"A court should take a flexible approach when deciding what parties need to be present for a just resolution of the suit." CP Solutions, 553 F.3d at 159 (citation omitted).  Rule 19(b) specifies four factors that a court must examine:

---

[5] QLT was formed and exists under the laws of the British Virgin Island and has its principal place of business in Bermuda.  As such, it is considered a foreign citizen for purposes of diversity jurisdiction.  Universal Reinsurance Co., Ltd. v. St. Paul Fire and Marine Ins. Co., 312 F.3d 82, 86 (2d Cir. 2002).

[6] Effective December 1, 2007, Rule 19(b) no longer uses the term "indispensable."  See Fed. R. Civ. P. 19 Advisory Committee's note to 2007 amendment.  The term is used here for the sake of convenience.

> (1) whether a judgment rendered in a person's absence
> might prejudice that person or parties to the action,
> (2) the extent to which any prejudice could be
> alleviated, (3) whether a judgment in the person's
> absence would be adequate, and (4) whether the
> plaintiff would have an adequate remedy if the court
> dismissed the suit.

CP Solutions, 553 F.3d at 159 (citing Fed. R. Civ. P. 19(b)).

"Whether a person is 'indispensable,' that is, whether a

particular lawsuit must be dismissed in the absence of that

person, can only be determined in the context of a particular

litigation."  Curley v. Brignoli, Curley & Roberts Assocs., 915

F.2d 81, 90 (2d Cir. 1990) (quoting Provident Tradesmens Bank &

Trust Co. v. Patterson, 390 U.S. 102, 118 (1968)).

QLF is not an indispensable party in this action and may be

dropped to preserve diversity jurisdiction.  As to the first two

Rule 19(b) factors, neither QLF nor the remaining parties to the

action, QLT and Tower, would suffer any prejudice if QLF is

dropped.  Any prejudice that would be suffered by QLF or QLT is

prejudice that they are obviously willing to bear.  CP

Solutions, 553 F.3d at 159.  As for Tower, it makes no practical

difference whether the claims in the FAC are prosecuted solely

by QLT, as opposed to QLF, or by a combination of QLF and QLT.

The FAC alleges that QLT, like QLF, is an "affiliate" within

Quantlab that owns some of the trade secrets that would be

disclosed if Xu begins work at Tower.  The FAC further alleges

that QLT is an express third-party beneficiary of the Noncompete

Agreement between QLF and Xu.  As such, it appears on the face
of the FAC that QLT has standing to bring the claims stated
therein.[7]

Tower argues that leaving QLT to litigate plaintiffs'
claims would be prejudicial because neither QLF nor Xu, the only
parties to the Noncompete Agreement, would be present to be
examined or bound by the Court's decisions.  Tower also
complains that it would be subject to the additional expense and
effort, and possibly inconsistent decisions, arising from
litigating this action and any separate action that QLF may
file.  Tower points to the Texas action as illustrative of that
burden.

Tower's arguments are unavailing.  First, Tower is free to
obtain any discovery it requires from Xu or QLF as non-party
witnesses.  Cf. Newman-Green, 490 U.S. at 838.  Further, if QLF
is dropped as a plaintiff, Xu may be joined as a defendant
without destroying diversity.  Second, there is no indication
that QLF intends to file another lawsuit concerning these events
in state court.  In any event, the fact that Tower may be

---

[7] With respect to the tortious interference claim, New York state
courts have long held that third-party beneficiaries of a
contract may bring a claim for tortious interference with that
contract.  See, e.g., Debary v. Harrah's Operating Co., Inc.,
465 F. Supp. 2d 250, 262 (S.D.N.Y. 2006) (citing cases); Assoc.
Flour Haulers & Warehousemen, Inc. v. Hoffman, 26 N.E.2d 7, 10
(N.Y. 1940).

subjected to a separate lawsuit by QLF in a state court is not sufficiently prejudicial to prevent QLF from being dropped from this action.  Cf. St. Paul Fire, 409 F.3d at 81 (dropping non-diverse plaintiff even though defendant "may have to defend two or more actions on the same tort").

As to the third Rule 19(b) factor, "adequacy refers to the 'public stake in settling disputes by wholes, whenever possible.'"  CP Solutions, 553 F.3d at 160 (quoting Republic of Philippines v. Pimentel, 553 U.S. 851, 128 S.Ct. 2180, 2193 (2008)).  "Thus, this factor concerns the social interest in the efficient administration of justice and the avoidance of multiple litigation."  CP Solutions, 553 F.3d at 160 (citation omitted).  The absence of QLF will not prevent QLT from being granted the full equitable and legal relief sought in the FAC.  In addition, the threat of multiple lawsuits at this stage is still remote at best.  Although the Texas action is pending between QLF and Xu, Tower is not currently a party to that action as its petition to intervene has been denied by the Texas court.  Further, there is no indication that QLF has any intention of filing another lawsuit against Tower in state court given that QLT is fully capable of representing Quantlab's claims against Tower in this action.

As to the fourth Rule 19(b) factor, it does not appear that QLT would be deprived of an adequate remedy were this action

dismissed.  QLT and QLF are able to bring an action against
Tower in state court.  But, "when federal diversity jurisdiction
will exist if nondiverse parties are dropped, the bare fact that
a state court forum is available does not, by itself, make it
appropriate to dismiss the federal action."  Id. at 161
(citation omitted).  Accordingly, because QLF is not an
indispensable party, it may be dropped to preserve diversity
jurisdiction, and this action may proceed with QLT as the sole
plaintiff.


3.   Tower's Motion to Dismiss

     Premised on its contention that joinder of Xu will destroy
diversity, Tower moves to dismiss the FAC pursuant to Fed. R.
Civ. P. 12(b)(7) for failure to join Xu.  Tower asserts Xu is a
necessary and indispensable party under Fed. R. Civ. P. 19.

     Rule 19 sets forth a two-step test for determining whether
a court must dismiss an action for failure to join an
indispensable party.  Viacom Int'l Inc. v. Kearney, 212 F.3d
721, 724 (2d Cir. 2000).  First, a court must determine whether
an absent party is a "necessary" party under Rule 19(a).  Id.
Second, if a court makes a threshold determination that a party
is necessary under Rule 19(a) and joinder of the absent party is
not "feasible" for jurisdictional or other reasons, the court
must then determine whether the party is "indispensable" under

Rule 19(b).  <u>Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.</u>,
500 F.3d 171, 180 (2d Cir. 2007).  If, however, the party is
necessary and joinder <u>is</u> feasible, then the court orders joinder
and the matter will proceed.

Because QLT, the sole remaining plaintiff, is a foreign
citizen and Xu is a citizen of Texas, Xu's joinder as a
defendant is feasible and would not defeat diversity
jurisdiction.  Tower's contention that Xu is a citizen of China
for purposes of determining diversity jurisdiction is without
merit.  "[A]n alien admitted to the United States for permanent
residence shall be deemed a citizen of the State in which such
alien is domiciled."  28 U.S.C.A. § 1332(a).  Xu is a legal
permanent resident domiciled in Texas, and as such, has Texas
citizenship for purposes of diversity jurisdiction.
Accordingly, Tower's motion to dismiss pursuant to Fed. R. Civ.
P. 12(b)(7) is denied.


4.  Tower's Motion to Vacate the Temporary Restraining Order
Tower moves, in the alternative, to vacate the March 19,
2010 temporary restraining order on the grounds that Tower
petitioned to intervene in the Texas action and that all issues
raised by plaintiffs in this case could be addressed in the
Texas action.  Since Tower filed its motion to vacate, however,
the Texas court denied Tower's petition to intervene.  Tower's

motion to vacate the temporary restraining order is therefore
denied.

## CONCLUSION

Tower's April 13 motion to dismiss or, in the alternative,
to vacate the March 19, 2010 temporary restraining order, is
denied. Plaintiffs' application to drop QLF as a plaintiff in
order to preserve diversity jurisdiction is granted. The Clerk
of Court shall terminate QLF as a plaintiff.

SO ORDERED:

Dated:   New York, New York
         May 28, 2010

                                    DENISE COTE
                            United States District Judge